

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 29, 2024

**By ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

     **Re:**   ***United States v. Michael D'Angelo*, 23 Cr. 327 (PGG)**

Dear Judge Gardephe:

     The Government respectfully submits this letter in advance of the September 5, 2024 sentencing of the defendant, Michael D'Angelo. For the reasons set forth below, the Government submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 63 to 78 months' imprisonment would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

## I.    Offense Conduct

     On November 17, 2022, D'Angelo and a co-conspirator ("CC-1") posed as members of law enforcement to gain access to a home, and then robbed the three individuals inside (the "Robbery"). (PSR ¶ 11).

     On the evening before the Robbery—November 16, 2022—D'Angelo and CC-1 (the "Robbers") visited a home in Fair Lawn, New Jersey. The Robbers told the person who answered the door ("Victim-1"), who the Robbers appear to have known was awaiting the release of a close family member from prison, that they were there to conduct a home inspection on behalf of the Department of Justice. (*Id.*). After Victim-1 told the Robbers that her children were inside the home, the Robbers left. (*Id.*). The home's doorbell camera captured D'Angelo (right) wearing a

radio lapel microphone, an Atlanta Falcons baseball cap, and black gloves; and CC-1 (left) wearing what appeared to be a law enforcement badge:



(*Id.*).

On the morning of November 17, 2022, the Robbers returned to the home.  (*Id.* ¶ 12). D'Angelo (right) again wore a radio lapel microphone, an Atlanta Falcons baseball cap, and black gloves; and CC-1 (left) again wore what appeared to be a law enforcement badge:



(*Id.*).  The badge worn by CC-1 bore the badge number 990:



After Victim-1 allowed the Robbers inside the home, the Robbers demanded money and property from her and two other individuals ("Victim-2" and "Victim-3") inside the home.  (*Id.*).  Victim-2 saw one of the Robbers display a gun.[1]  (*Id.*).  Victim-1 picked up a kitchen knife to defend herself, and sustained a laceration at the base of her finger when one of the Robbers took the knife away from her.  (*Id.*).  The Robbers restrained the three victims with zip ties, ransacked the home, and fled.  (*Id.*).  They stole, among other things, jewelry, an Apple Watch, a car key, and approximately $3,500 in cash.  (*Id.*).

After developing evidence of D'Angelo's commission of the Robbery (*see id.* ¶¶ 13-15), law enforcement officers obtained a warrant to search D'Angelo's home.  (*Id.* ¶ 17).  On May 22, 2023, law enforcement officers searched D'Angelo's home, arrested D'Angelo, and recovered, among other things, the following robbery tools from inside a black bag in D'Angelo's living room:

- A handgun loaded with the charged ammunition (six .45 caliber bullets);
- a law enforcement-style badge with the badge number 990;
- police scanners with radio lapel microphones;
- black gloves;
- pepper spray; and
- zip ties.

---

[1] Victim-1 and Victim-3 stated that they did not recall seeing a gun during the Robbery, and that their knowledge of the gun came from speaking with Victim-2.

(*Id.*).  Photographs of D'Angelo's robbery kit are below.




D'Angelo admitted that he was the sole occupant of the home, and the owner of the handgun and ammunition.  (*Id.* ¶ 18).  D'Angelo was prohibited from possessing firearms and ammunition based on his prior felony convictions.  (*See id.* ¶ 19; Section II *infra*).

## II.    D'Angelo's Criminal History

The instant offense is D'Angelo's fourth criminal conviction, and third for an offense involving burglary or a similar offense.[2]  In 1994, D'Angelo was sentenced to one year of imprisonment for a 1992 second-degree attempted burglary, in which he acted as a lookout.  (PSR ¶ 40).  That same year, D'Angelo was sentenced to 18 to 54 months' imprisonment for a 1993 burglary during which D'Angelo and others held the victim at gunpoint, restrained the victim, and stole money from a safe.  (*Id.* ¶ 41).  D'Angelo served 16 months' imprisonment for the 1993 burglary.

## III.    Procedural History

D'Angelo was charged by complaint on May 22, 2023, and by indictment on June 28, 2023, with one count of possession of ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  D'Angelo filed a motion to dismiss the indictment on Second Amendment grounds pursuant to *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), which this Court denied on December 31, 2023.  (Dkt. 26).

On May 3, 2024, D'Angelo pled open to the indictment.

---

[2] D'Angelo's fourth criminal conviction was a 1993 New York conviction for resisting arrest, for which he was sentenced to five years' probation.  (PSR ¶ 39).

IV.    **Guidelines Calculation**

a.    **Application of the Cross Reference**

The Government agrees with Probation that, pursuant to the cross reference provision at U.S.S.G. § 2K2.1(c)(1)(A), because D'Angelo possessed the charged ammunition in connection with—or, at a minimum, with knowledge or intent that it would be possessed in connection with—a robbery, U.S.S.G. § 2X1.1 applies.

D'Angelo does not dispute (i) that he committed the Robbery on November 17, 2022, or (ii) that, on May 22, 2023, D'Angelo's ammunition and gun were found inside a bag containing the tools D'Angelo and CC-1 used to commit the Robbery. Those facts, standing alone, are more than sufficient for this Court to apply the robbery cross reference. As described below, those facts support by a preponderance of the evidence[3] that the ammunition recovered from D'Angelo's home on May 19, 2023 was also possessed in connection with the Robbery or, at a minimum, that D'Angelo possessed the ammunition in May 2023 with knowledge or intent to commit a future robbery. Each of D'Angelo's arguments to the contrary can be swiftly rejected.

*First*, D'Angelo notes that the May 19, 2023 search warrant for his residence did not explicitly authorize the seizure of a firearm or ammunition.[4] (Dkt. 39 at 3-4). According to D'Angelo, "if there was probable cause to believe [he] possessed a firearm or ammunition in connection with the robbery, the warrant would have specifically authorized the seizure of such." (*Id.* at 4). D'Angelo ignores that the search warrant affidavit submitted in support of that warrant stated, based on interviews of the victims, that "a pistol was pointed at the victims by one of the suspects." D'Angelo further ignores that on the same day—May 19, 2023—he was charged by complaint in Bergen County, New Jersey with multiple firearms-related offenses stemming from the Robbery, including: armed robbery, in violation of N.J. Rev. Stat. § 2C:15-1(a)(1); criminal possession of a firearm, in violation of N.J. Rev. Stat. §§ 2C:39-4(a) and (b)(1); and aggravated assault by means of pointing a firearm, in violation of N.J. Rev. Stat. § 2C:12-1(b)(4). D'Angelo's claim that, prior to the recovery of D'Angelo's robbery kit on May 22, 2023, law enforcement lacked probable cause that he had possessed (or aided and abetted the possession of) a gun in connection with the Robbery is simply false. It is also irrelevant to the calculation of his Guidelines.

*Second*, D'Angelo argues that because only one victim (Victim-2) personally saw a gun during the Robbery, this Court should not infer that a gun was possessed during the robbery. (Dkt. 39 at 4-5). D'Angelo fails to marshal any facts that meaningfully impugn Victim-2's credibility, and indeed has advised the Government through counsel that he is *not* seeking a *Fatico* hearing.

---

[3] When finding facts relevant to sentencing for the purpose of a Guidelines calculation, the Court must use the preponderance of the evidence standard. *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007).

[4] The search warrant authorized seizure of, among other things, "property used in [the] commission of [the Robbery]," and D'Angelo does not argue that the gun and ammunition could have been suppressed.

He merely notes that Victim-2 "volunteered" information about the presence of the gun nearly an hour into her interview with law enforcement—an unremarkable fact with no bearing on her credibility. (*Id.* at 5). He further notes that Victim-1 and Victim-3 did not see a gun (*id.*), omitting the fact that (i) those victims did not have the same vantage point—and may not even have been in the same room—as Victim-2 at the time she saw the gun, and (ii) for that reason, both victims believed Victim-2 when she told them the Robbers had a gun.[5]  In any event, Victim-2's statement that a gun was used during the Robbery simply provides further support for an inference already amply supported by the undisputed facts—*i.e.*, the recovery of the loaded gun alongside several other tools used in the Robbery: police scanners with radio microphones, black gloves, zip ties, and the law enforcement badge bearing the badge number 990.

        *Third*, D'Angelo argues that there is insufficient evidence that any gun and ammunition possessed during the Robbery were the same gun and the same ammunition later found in D'Angelo's home alongside the other tools of the Robbery. (Dkt. 39 at 5).  D'Angelo notes that the Robbery tools were found in a bag that does not appear to have been brought inside the home during the Robbery, and that six months passed between the Robbery and the May 22, 2023 search of D'Angelo's home.  D'Angelo does not, however, explain how those facts support the inference that the loaded gun was not carried during the Robbery.  Rather, the most plausible inference available from the undisputed facts is that D'Angelo possessed the handgun and the ammunition inside it in connection with the Robbery, and then stored those items—alongside every other item found in the robbery kit—in the bag.

        *Fourth*, D'Angelo incorrectly assumes that this Court *must* find that the gun and ammunition were possessed in connection with the Robbery in order to apply the cross reference.  Not so.  The cross-reference also applies if D'Angelo possessed the ammunition in May 2023 "with knowledge or intent that it would be used or possessed in connection with another offense."  U.S.S.G. § 2K2.1(c).  In other words, even in the unlikely event that D'Angelo added the ammunition to his robbery kit *after* November 17, 2022, for use in a future home invasion and robbery, that fact would nonetheless be sufficient to trigger application of the cross reference.[6]

        Accordingly, pursuant to Section 2X1.1(a), the Guideline for the substantive offense—robbery—applies, and provides for a base offense level of 20.  *See* U.S.S.G. § 2B3.1(a).

---

[5] For example, when Victim-1 was in the kitchen of the home attempting to defend herself with a knife (*see* PSR ¶ 12), she was not "confined to [the same] small area" as Victim-2.  (*See* Dkt. 39 at 5).  Although the Government is prepared to present additional evidence and testimony at a *Fatico* hearing, for the reasons set forth above, the undisputed facts provide sufficient grounds for the Court to infer the presence of a gun during the Robbery.

[6] If this Court were to apply the cross reference based on D'Angelo's intent to possess the ammunition in connection with a future home invasion, each of the other enhancements would remain applicable, and D'Angelo's Guidelines range therefore would be unchanged.

**b. Other Guidelines Calculations**

The Government also agrees with Probation's other Guidelines calculations.[7]  Because a firearm was brandished during the Robbery, a five-level increase applies.[8]  *See* U.S.S.G. §2B3.1(b)(2)(C).  Because the victims were physically restrained to facilitate commission of the Robbery, a two-level increase applies.  *See* U.S.S.G. §2B3.1(b)(4)(B).  Finally, because D'Angelo posed as a law enforcement officer to commit the Robbery, thereby holding himself out as a person in a position of public trust, a two-level increase applies.  *See* U.S.S.G. §3B1.3 and application note 3.  After a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), D'Angelo's total offense level is 26.

D'Angelo has zero criminal history points, which places him in Criminal History Category I and results in a Guidelines range of 63 to 78 months' imprisonment.

**V.    Applicable Law**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence.  *Id.* at 264.  As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and

---

[7] The Government is no longer seeking application of the two-level increase for bodily injury under U.S.S.G. § 2B3.1(b)(3)(A).

[8] Should this Court order a *Fatico* hearing, the Government may seek application of the six-level enhancement for "otherwise us[ing]" a firearm, subject to potential witness testimony regarding the manner in which the gun was used during the Robbery.  *See* §2B3.1(b)(2)(B).

(D)     to provide the defendant with needed educational or vocational training, medical
        care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## VI.    A Sentence Within the Guidelines Range is Warranted

The Government respectfully submits that a within-Guidelines sentence of 63 to 78 months' imprisonment is necessary and appropriate in this case for the reasons set forth below.[9]

*First*, D'Angelo committed a serious, violent offense. As set forth above, D'Angelo did not merely illegally possess ammunition; he possessed that ammunition—loaded inside a handgun—in connection with an armed robbery. Contrary to D'Angelo's claim that this offense reflects a mere lapse in judgment (*see* Dkt. 39 at 1), his commission of the Robbery shows careful planning and premeditation: D'Angelo targeted vulnerable victims anticipating the release of a loved one from prison, visiting the home on consecutive days. He exploited the victims' trust in federal law enforcement, gaining entry to the home by impersonating a Department of Justice official. And he brought equipment that could be used to incapacitate, restrain, and even kill his victims, should the need arise: pepper spray, zip ties (which the Robbers used), and a loaded gun. In sum, in service of his own greed, D'Angelo tricked his victims, terrorized them, and robbed them. He thereby created a significant risk that his victims would be killed or seriously injured by his gun and ammunition (or by the knife with which Victim-1 attempted to defend herself).

Then, rather than abandoning his criminal activity, D'Angelo persisted in it by continuing to illegally possess the gun, ammunition, and other robbery tools. His ongoing possession of these items created additional risk to the public of gun violence—in particular, of additional armed robberies involving the deception and restraint of victims.

*Second*, a Guidelines sentence is necessary to promote respect for the law and specific deterrence. The instant offense is D'Angelo's third felony conviction stemming from his participation in a home invasion, and his second involving the display of a firearm. Because D'Angelo committed those offenses many years ago, they are not reflected in his criminal history score. This Court should nonetheless take those convictions into account in sentencing D'Angelo, as they indicate that two prior, significant terms of incarceration were insufficient to deter him from—at the age of 50—re-engaging in violent, dangerous conduct.

This Court should also take into account D'Angelo's attempt to minimize the severity of his conduct by disputing the role played by the handgun and ammunition in the Robbery. D'Angelo's sentencing submission reflects an attempt to avoid responsibility—and punishment— for the most troubling and dangerous aspect of his conduct: his possession of ammunition carried, and/or intended to be carried, in connection with a violent home invasion.[10]

---

[9] Probation recommends a sentence of 63 months' imprisonment, to be followed by three years' supervised release.

[10] D'Angelo's meritless argument that the Robbery is not relevant conduct under the Guidelines is inconsistent with his request, in the alternative, that the Court take into account the 15 months'

*Third*, a significant incarceratory sentence will promote general deterrence. The possession of firearms and ammunition by convicted felons presents a grave public safety risk, in New York City and across the country. That risk is significantly heightened when convicted felons carry those guns, or provide them to others, in connection with the commission of violent offenses. A within-Guidelines sentence would help send a message to similarly situated individuals that possessing firearms and ammunition for use in committing violent crimes will be met with severe consequences.

## VII.    Conclusion

For the reasons explained above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 63 to 78 months' imprisonment.[11]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____

Henry L. Ross
Assistant United States Attorney
(212) 637-2442

Cc: Marne L. Lenox, Esq. (by ECF)

_____

incarceration that will be credited toward his anticipated sentence in Bergen County, New Jersey. D'Angelo's anticipated New Jersey sentence is relevant to, and should run concurrently with, his federal sentence only if the Court accepts the Government's argument that the Robbery is relevant conduct. *See* U.S.S.G. § 5G1.3(c) ("If . . . a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction . . . the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.").

[11] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same). The Government agrees with Probation's recommendation that D'Angelo's conditions of supervised release include a special condition permitting his electronic devices to be searched. In the instant case, D'Angelo used a cellphone in furtherance of the Robbery, and his possession of electronic devices (the cellphone and a stolen Apple Watch) aided law enforcement's identification of him as a perpetrator. (*See* PSR ¶¶ 13-14). Accordingly, the proposed special condition is reasonably related to D'Angelo's offense of conviction.